# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. _____

CROSSWINDS REHAB INC., LLC d/b/a
CROSSWINDS HEALTH AND
REHABILITATION CENTER,
1780 GOLDEN, LLC d/b/a
CROSS POINTE CARE CENTER,
206 GOLDEN, LLC
d/b/a THE CROSSROADS,
1351 GOLDEN, LLC d/b/a CROSS
TERRACE REHABILITATION CENTER,
CROSS LANDINGS INC, LLC d/b/a
CROSS LANDINGS HEALTH AND
REHABILITATION CENTER,
BGI RETIREMENT, LLC f/d/b/a
CROSSBREEZE CARE CENTER, 1755
GOLDEN, LLC d/b/a CROSSBREEZE
CARE CENTER, CROSS GARDENS CARE
CENTER, LLC f/d/b/a CROSS GARDENS
CARE CENTER, 190 GOLDEN, LLC d/b/a
CROSS GARDENS CARE CENTER, and SAINTS
120, LLC d/b/a CROSS CARE CENTER,
on behalf of themselves
and all others similarly situated,

      Plaintiffs,

**CLASS ACTION**
**JURY DEMAND**

vs.

HUMANA MEDICAL PLAN, INC.,
AMERICAN ELDERCARE, INC.,
UNITED HEALTHCARE OF
FLORIDA, INC., COVENTRY HEALTHCARE
OF FLORIDA, INC., MOLINA
HEALTHCARE OF FLORIDA, INC.,
SUNSHINE STATE HEALTH PLAN, INC.,
and AMERIGROUP FLORIDA, INC.,

      Defendants.

_____/

## CLASS ACTION COMPLAINT

Plaintiffs, CROSSWINDS REHAB INC., LLC d/b/a CROSSWINDS HEALTH AND REHABILITATION CENTER ("Crosswinds"), 1780 GOLDEN, LLC d/b/a CROSS POINTE CARE CENTER ("Cross Pointe"), 206 GOLDEN, LLC d/b/a THE CROSSROADS ("Crossroads"), 1351 GOLDEN, LLC d/b/a CROSS TERRACE REHABILITATION CENTER ("Cross Terrace"), CROSS LANDINGS INC, LLC d/b/a CROSS LANDINGS HEALTH AND REHABILITATION CENTER ("Cross Landings"), BGI RETIREMENT, LLC f/d/b/a CROSSBREEZE CARE CENTER, 1755 GOLDEN, LLC d/b/a CROSSBREEZE CARE CENTER (BGI RETIREMENT, LLC and 1755 GOLDEN, LLC shall collectively be referred to herein as "Crossbreeze"), CROSS GARDENS CARE CENTER, LLC f/d/b/a CROSS GARDENS CARE CENTER, 190 GOLDEN, LLC d/b/a CROSS GARDENS CARE CENTER (CROSS GARDENS CARE CENTER, LLC and 190 GOLDEN, LLC shall collectively be referred to herein as "Cross Gardens"), and SAINTS 120, LLC d/b/a CROSS CARE CENTER ("Cross Care") (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, sue Defendants, HUMANA MEDICAL PLAN, INC. ("Humana"), AMERICAN ELDERCARE, INC. ("American Eldercare"), UNITED HEALTHCARE OF FLORIDA, INC. ("United"), COVENTRY HEALTHCARE OF FLORIDA, INC. ("Coventry"), MOLINA HEALTHCARE OF FLORIDA, INC. ("Molina"), SUNSHINE STATE HEALTH PLAN, INC. ("Sunshine"), and AMERIGROUP FLORIDA, INC. ("Amerigroup") (collectively the "Defendants"), and allege:

## **NATURE OF THE CASE**

1.      This class action challenges Defendants' systematic business practice of illegally withholding interest owed on overdue payments to Medicaid providers who have delivered healthcare services to the Defendants' plan subscribers.

2.      Plaintiffs are Skilled Nursing Facilities ("SNFs") who provide healthcare services

to some of Florida's most vulnerable citizens—nearly 71,000 elders and individuals with disabilities—many of whom require 24-hour complex medical care and suffer from cognitive impairments like Alzheimer's.

3.      Plaintiffs rely on the prompt payment of Medicaid funds from Defendants to deliver quality healthcare services.

4.      Florida administers Medicaid benefits through the Statewide Medicaid Managed Care Program ("Medicaid Managed Care Program"). The Agency for Health Care Administration ("Agency") is responsible for implementing the Medicaid Managed Care Program. Private insurance companies known as Managed Care Organizations ("MCOs"), like Defendants, compete for a limited number of contracts with the Agency to receive State and Federal Medicaid funding in exchange for delivering Medicaid benefits ("Managed Care Contract").

5.      Defendants are the gatekeepers to Medicaid benefits in Florida. Since the inception of the Medicaid Managed Care Program, Defendants have been awarded the majority of the Managed Care Contracts available with the Agency. Defendants have established Managed Care Plans, which Florida residents must enroll in to gain access to a network of Medicaid providers who have entered into agreements with Defendants. Medicaid providers, including Plaintiffs, offer certain covered medical services pursuant to a provider agreement in exchange for payment.

6.      Plaintiffs and Class members must submit a standard coded claim form to receive payment from Defendants. Florida law requires Defendants to pay claims within a specific timeframe set forth in the prompt pay provisions of the Health Maintenance Organization Act (the "HMO Act"). Once that timeframe expires, interest accrues at a rate of 12% per year. These provisions of the HMO Act are incorporated into all Managed Care Contracts. Accordingly, every Managed Care Contract provides a direct and primary benefit to Plaintiffs and the Class in the

3

forms of payment on claims and 12% interest on overdue payments.

7.      Plaintiffs have provided covered medical services to the Defendants' Managed Care Plan subscribers. Despite receiving proper claims for payment, Defendants have engaged in a pattern and practice of fabricating reasons to delay payments of claims to Plaintiffs, and then paying an improper amount of interest, if any, on overdue payments. According to a Florida Health Care Association report, on average, SNFs are carrying over $200,000 in outstanding claims per center with $86,000 over 90 days past due. While awaiting payment, however, SNFs like Plaintiffs continue to provide healthcare to Medicaid recipients and incur the costs necessary to do so.

8.      Defendants retain the interest owed to Plaintiffs and the Class to maximize profits without regard for the negative impact it has on the Medicaid providers across the State. Defendants' unlawful conduct disrupts Medicaid providers' daily operations and jeopardizes Plaintiffs and Class members' ability to deliver quality healthcare services to Florida residents.

9.      This class action lawsuit is brought on behalf of all Medicaid providers who have submitted claims to Defendants that were untimely paid and without the full amount of interest required under the HMO Act, as incorporated. Plaintiffs bring claims under the statutory and common laws of Florida for declaratory and monetary relief. Among other appropriate relief, Plaintiffs seek to recover for all Class members the amount of interest unlawfully retained by Defendants.

## PARTIES

### Plaintiffs

10.     Plaintiff Crosswinds is a Delaware Limited Liability Company authorized to transact business in Florida as Crosswinds Rehab, LLC with its principal place of business in Greenville, Florida.

11.     Plaintiff Cross Pointe is a Delaware Limited Liability Company authorized to transact business in Florida with its principal place of business in Dania Beach, Florida.

12.     Plaintiff Crossroads is a Delaware Limited Liability Company authorized to transact business in Florida with its principal place of business in Davenport, Florida.

13.     Plaintiff Cross Terrace is a Delaware Limited Liability Company authorized to transact business in Florida with its principal place of business in Dunedin, Florida.

14.     Plaintiff Cross Landings is a Delaware Limited Liability Company authorized to transact business in Florida with its principal place of business in Monticello, Florida.

15.     Plaintiff BGI Retirement, LLC f/d/b/a Crossbreeze Care Center is a Florida Limited Liability Company authorized to transact business in Florida with its principal place of business in Sarasota, Florida.

16.     Plaintiff 1755 Golden, LLC d/b/a Crossbreeze Care Center is a Delaware Limited Liability Company authorized to transact business in Florida with its principal place of business in Sarasota, Florida.

17.     Plaintiff Cross Gardens Care Center, LLC f/d/b/a Cross Gardens Care Center is a Delaware Limited Liability Company authorized to transact business in Florida with its principal place of business in Miami, Florida.

18.     Plaintiff 190 Golden, LLC d/b/a Cross Gardens Care Center is a Delaware Limited Liability Company authorized to transact business in Florida with its principal place of business in Miami, Florida.

19.     Plaintiff Cross Care is a Delaware Limited Liability Company authorized to transact business in Florida with its principal place of business in Jacksonville, Florida.

**Defendants**

20.     Defendants are health maintenance organizations registered with the Florida Office of Insurance Regulation. Each of the Defendants entered into a Managed Care Contract with the Agency to administer Medicaid benefits to eligible Florida residents.

21.     Defendant Humana is a Florida Corporation doing business in Miami-Dade County with its principal place of business in Miramar, Florida.

22.     Defendant American Eldercare is a Florida corporation doing business in Miami-Dade County with its principal place of business in Delray Beach, Florida. Humana acquired American Eldercare in September 2013.

23.     Defendant United is a Florida corporation doing business in Miami-Dade County with its principal place of business in Delray Beach, Florida.

24.     Defendant Coventry is a Florida corporation doing business in Miami-Dade County with its principal place of business in Sunrise, Florida.

25.     Defendant Molina is a Florida corporation doing business in Miami-Dade County with its principal place of business in Doral, Florida.

26.     Defendant Sunshine is a Florida corporation doing business in Miami-Dade County with its principal place of business in St. Louis, Missouri.

27.     Defendant Amerigroup is a Florida corporation doing business in Miami-Dade County with its principal place of business in Tampa, Florida.

## JURISDICTION AND VENUE

28.     The Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

29.     The amount in controversy exceeds $5,000,000 and there are at least one hundred

members of the putative class.

30.     This Court has jurisdiction over Defendants because they are Florida corporations authorized to conduct business in Florida, are doing business in Florida, and have registered with the State of Florida, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion of their services.  This purposeful availment renders the exercise of jurisdiction by this Court over the Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

31.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5,000,000 and diversity exists between Plaintiffs and Defendant Sunshine.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5,000,000 amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

32.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because the Defendants transact business and may be found in this District.

33.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

### Background on the Managed Care Industry

34.     Decades ago managed care was introduced in the United States in response to concerns over the growing costs of healthcare services. Managed care involves a tripartite relationship between insurance companies, known as Managed Care Organizations ("MCO"), healthcare providers (e.g. physicians, hospitals, SNFs, etc.), and patients. MCOs establish health

insurance plans that give insureds access to a network of providers who have agreed to render certain medical services in exchange for compensation from the MCO. Consequently, MCOs control the delivery of healthcare services by channeling subscribers into their selected network of providers and influencing the selection of treatment options.

35.     MCOs are able to control the cost, utilization, and quality of healthcare services by entering into agreements with healthcare providers. MCOs will only enter into agreements with providers who meet specified quality standards. The provider agreements will detail the rates at which providers will be reimbursed for rendering covered services to the MCO's insureds when such services are medically necessary. In some cases, the reimbursement rates are set by statute.

36.     Providers operate on a fee for service basis. To receive payment, providers must submit a standard coded claim form to the MCO. Claims for payments include codes that identify the diagnosis and procedure performed as well as modifiers for the degree of difficulty, complexity, and multiplicity.

37.     The purpose of the standard coded claim forms is to present a uniform language that accurately describes the medical services a provider has rendered, and to give MCOs the information they need to process a claim for payment.

38.     Standard coded claim forms should result in streamlined and prompt payment to providers. Yet MCOs routinely deny claims, resulting in providers focusing their efforts on claims disputes and away from delivering quality healthcare services. Thus, providers lose a significant amount of time and revenue. According to a 2013 report by the American Medical Association, providers could have saved more than $43 billion if MCOs paid claims correctly.

39.     As a result, many States require MCOs to pay properly submitted claims within a specific timeframe and provide for interest on overdue claims. *See e.g.*, Fla. Stat. §§ 627.613 and

641.3155. Nonetheless, MCOs regularly violate State prompt pay statutes. MCOs have intentionally delayed claims by, *inter alia*, implementing procedures that automatically pend claims in a state of suspense and calculated understaffing. Providers are thus deprived the time value of their money as well as one of the incentives to treat patients at a reduced rate.

40.     Moreover, MCOs have been subjected to intense scrutiny over the years related to their claims processing practices. Several of the largest MCOs in the country—including affiliates of some the Defendants here—settled a class action lawsuit brought by physicians alleging the MCOs engaged in a common fraudulent scheme to systematically deny, delay, and diminish payments to the physicians. The physicians brought Federal RICO and state law claims based on the MCOs uniform practice of automatically denying claims with certain codes, "downcoding," "bundling," ignoring modifiers, and intentionally delaying payment. Downcoding involves the denial or underpayment of claims submitted by providers by arbitrarily, and without prior notice, changing the code assigned to a particular service to a less expensive one. Bundling involves the denial or underpayment of claims submitted by providers by arbitrarily, and without prior notice, combing the codes of two or more procedures into one.

41.     Upon information and belief, Defendants have employed similar tactics to deprive Plaintiffs and Class members of the full amount of payment they are entitled to.

### Florida's Medicaid Managed Care Program

42.     Medicaid is a social program that is jointly funded by the States and Federal government to provide health care for families and individuals with limited resources. In 2013, Florida began to implement its Statewide Medicaid Managed Care program ("Medicaid Managed Care Program"). Florida's Medicaid Managed Care Program is the fourth largest in the nation by enrollment, and the sixth largest in terms of expenditures, accounting for over $18 billion in total

funds appropriated in fiscal year 2016-2017.

43.     The Medicaid Managed Care Program has two components: Long-Term Care ("LTC") and Managed Medical Assistance ("MMA"). The MMA component includes acute, medical, dental, behavioral and therapeutic services. The LTC Component covers nursing home care, hospice care, and other institutionalized care.

44.     Approximately 82% of all Florida Medicaid recipients are enrolled in either the LTC or MMA component, or both. As of December 2016, 94,320 Medicaid recipients were enrolled in an LTC plan and more than 3.2 million were enrolled in an MMA plan.

45.     The Agency for Health Care Administration ("Agency") administers the State's Medicaid program by contracting with MCOs to manage the way their enrollees receive health care services ("Managed Care Contracts"). MCOs compete for Managed Care Contracts through a competitive procurement process. Each Managed Care Contract covers a five-year period.

46.     The Agency awarded Managed Care Contracts to ten different companies for the MMA component, including all Defendants except American Eldercare. Defendants currently control the market for the delivery of LTC Medicaid services. Since the inception of the Managed Care Program, Defendants are the only MCOs to have been awarded Managed Care Contracts for the LTC component.

47.     Pursuant to each of the Managed Care Contracts, MCOs are permitted to operate in designated regions. For purposes of the Managed Care Program, Florida designated eleven regions encompassing all 67 counties.

48.     At least one of the Defendants' plans is available in every region. Amerigroup offers managed care plans in Regions 5, 6, 7 and 11 for the MMA component, and Regions 10 and 11 for the LTC component. Coventry offers a managed care plan for the MMA component in

Region 11, and Regions 6, 7, 10 and 11 for the LTC component. Humana's managed care plans for the MMA component are available in Regions 1, 6, 9 and 11, and, since acquiring American Eldercare, its managed care plans for the LTC component are available in all Regions. Molina offers managed care plans in Regions 4, 7, 9 and 11 for the MMA component, and Regions 5, 6 and 11 for the LTC component. Sunshine offers managed care plans in Regions 3 through 11 for the MMA component, and Regions 1 and 3 through 11 for the LTC component. Finally, United's managed care plans for the MMA component are available in Regions 3, 4 and 11, and Regions 2 through 9 and 11 for the LTC component.

49.     Defendants receive Medicaid payments under the Managed Care Contracts on a capitated basis, *i.e.*, a fixed rate per member per month. Defendants are entitled to invest the funding they receive. Any interest generated through investments with Medicaid payments are considered property of the Defendants and may be used at their discretion. Thus, Defendants are able to generate larger profits by holding on to Medicaid payments as long as possible before reimbursing Medicaid providers' claims for payment.

50.     The Florida Legislature, however, has mandated that every Managed Care Contract include a provision requiring Defendants to promptly pay Medicaid providers. Specifically, Section VIII(D)(1)(a) of every Managed Care Contract states "Pursuant to Section 409.967(2)(j), F.S., the Managed Care Plan shall comply with ss. 641.315, 641.3155, and 641.513, F.S." These provisions are known as the prompt pay provisions of the Health Maintenance Organization Act (the "Prompt Pay Provisions").

51.     Section 641.3155 sets forth certain timeframes by which Defendants must make payments to Medicaid providers after receiving a claim for payment. If the Defendants fail to promptly pay the Medicaid providers within the time established by the statute, the claim becomes

11

overdue ("Overdue Payment"). Overdue Payments bear "simple interest at 12% per year." Section 641.3155(5)(a)(4). Interest on an Overdue Payment for a claim or portions of a claim begins to accrue when the claim should have been paid. The interest is payable with the payment of the claim.

52.     Thus, Medicaid providers, like Plaintiffs, are direct and primary beneficiaries of the Managed Care Contracts. By including a provision in the Managed Care Contracts that requires Defendants to pay money to Medicaid providers, the Agency and Defendants have demonstrated a clear intent to provide a direct benefit to Plaintiffs and the putative Class. That direct benefit includes 12% interest on Overdue Payments.

53.     As explained below, Defendants have breached Section VIII(D)(1)(a) of the Managed Care Contracts by failing to pay Plaintiffs and the putative Class interest on Overdue Payments.

**Defendants Have Unlawfully Retained Money Owed to Medicaid Providers**

54.     Defendants have engaged in an industry-wide practice of intentionally delaying payment of claims to Medicaid providers in violation of the Prompt Pay Provisions. Defendants routinely issue payments on claims well beyond the statutory deadlines. Plaintiffs have consistently experienced delays ranging from 30 days to more than 100 days. Other Medicaid providers have also complained that it takes months to receive payments on claims.

55.     Defendants are fabricating reasons to reject otherwise proper claims. In many cases, Defendants are forcing Medicaid providers to jump through unnecessary, nonsensical hoops, only to ultimately pay the claim later. For example, Amerigroup has consistently received clean claims, but rejected them for failure to include information that was submitted, despite having said information. This delay tactic has forced the nursing facility to waste time working with

12

Amerigroup to resolve improper denials.

56.     The Florida Health Care Association ("FHCA") recently testified before the Florida Senate regarding delayed payments for Medicaid services. According to the FHCA, SNFs are regularly carrying over $200,000 in outstanding claims per center with $86,000 over 90 days past due, resulting in a statewide shortfall of $135 million.

57.     Defendants are delaying payments to generate larger profits through investment interest without regard to the fact that delayed payments negatively impact Medicaid providers' ability to deliver quality medical services.

58.     Moreover, MCOs are systematically withholding the full amount of interest owed on the Overdue Payments. A February 2016 report prepared by the Office of Inspector General for the Florida Department of Health found that MCOs generally did not pay interest with the reimbursement of Overdue Payments for claims submitted by County Health Departments. For the period of November 1, 2014 through August 31, 2015, the report concluded that MCOs failed to pay interest on 94.5% and 98.6% of Overdue Payments for paper and electronic claims, respectively. By withholding the 12% interest on Overdue Payments, MCOs deprived the County Health Departments of thousands of dollars in revenues.

59.     Defendants have also illegally withheld interest on Overdue Payments owed to Plaintiffs.

60.     Humana and American Eldercare have consistently failed to pay interest on Overdue Payments to Crosswinds and Cross Landings.

61.     Similarly, Amerigroup has deprived Crossbreeze and Cross Pointe of the full amount of interest on Overdue Payments. For example, Crossbreeze submitted a claim to Amerigroup for $8,168.19 on June 1, 2016, which was not paid until January 4, 2017, 208 days

after it was due. Amerigroup paid a mere 0.16% interest or $7.41. Similarly, Cross Pointe submitted a claim for $8,533.68 on April 4, 2016. Despite payment being made 63 days after it was due, Amerigroup paid $72.36 in interest, which amounts to only 2% interest. These claims were submitted electronically.

62.     Sunshine has likewise failed to pay Cross Gardens the full and proper interest owed on Overdue Payments. For example, Cross Gardens submitted a claim to Sunshine for $8,094.00 on November 7, 2016.  The claim was not paid until January 17, 2017.  Despite being paid 62 days after it was due, Sunshine only paid interest of $128.35, which amounts to 9.34% interest.  This claim was submitted electronically.

63.     Molina also deprived Cross Terrace of the full and proper interest owed on Overdue Payments.  For example, Cross Terrace submitted a claim to Molina for $1,018.88 on August 1, 2016.  The claim was not paid until January 4, 2017.  Despite being paid 147 days after it was due, no interest was paid.  This claim was submitted electronically.

64.     Coventry also deprived The Crossroads of the full and proper interest owed on Overdue Payments.  For example, The Crossroads submitted a claim to Coventry for $8,100.92 on February 2, 2016.  The claim was not paid until June 18, 2016.  Despite being paid 108 days after it was due, Coventry only paid interest of $199.61, which amounts to 8.33% interest.  In another instance, The Crossroads submitted a claim to Coventry for $2,090.50 on March 1, 2016.  The claim was not paid until June 18, 2016. Despite a payment that was made 80 days after it was due, Coventry paid no interest.  These two claims, both for one resident, had to be submitted in paper form due to an error in Coventry's system which prevented The Crossroads from billing electronically and availing itself of expedited payment deadlines.

65.     United also deprived Cross Care of the full and proper interest owed on Overdue

Payments.  For example, Cross Care submitted a claim to United for $6,579.41 on January 7, 2016. The claim was not paid until April 12, 2016.  Despite being paid 87 days after it was due, United paid no interest.  In another instance, Cross Care submitted a claim to United for $6,993.30 on October 7, 2015.  The claim was not paid until June 17, 2016. Despite a payment that was made 235 days after it was due, United paid no interest.  In yet another instance, Cross Care submitted a claim to United for $7,300.19 on October 5, 2015.  The claim was not paid until April 13, 2016. Despite a payment that was made 182 days after it was due, United paid no interest.  These claims were submitted electronically.

66.     Defendants' unlawful practice of withholding the full amount of interest owed to Medicaid providers on Overdue Payments has deprived Plaintiffs and the Class of revenues they were entitled to and threatened their ability to deliver quality healthcare services.

## CLASS ACTION ALLEGATIONS

67.     Plaintiffs bring this action against the Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other Medicaid providers similarly situated.  Plaintiffs seek to represent the following class:

> All Medicaid providers in the State of Florida who did not receive 12% interest on Overdue Payments for claims submitted to the Defendants.

68.     Plaintiffs reserve the right to modify, amend and/or expand the definition of the proposed class before the Court determines whether certification is appropriate.

69.     The Class satisfies the requirements of Rule 23(a), 23(b)(2) and 23(b)(3).

70.     **Numerosity.** The Class consists of hundreds of Medicaid providers throughout the State of Florida and is so numerous that joinder of all members would be impracticable. The disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court.

71.    **Ascertainability.** The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by the Defendants. Notice of this action can thus be provided to all members of the proposed Class.

72.    **Typicality.** Plaintiffs are Medicaid providers that submitted claims for payment to the Defendants after providing Medicaid services to the Defendants' subscribers. Plaintiffs' claims are typical of the claims of all Class members as all Class members are similarly affected by the Defendants' wrongful conduct as complained of herein.

73.    **Adequacy.** Plaintiffs are committed to prosecuting this action, will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class action litigation. Plaintiffs have no interests antagonistic to or in conflict with other members of the Class.

74.    **Commonality and Predominance.** Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class. The questions of law and fact common to the Class include, but are not limited to:

    a.  Whether Defendants have a systematic business practice of intentionally delaying payments on claims submitted by Plaintiffs and the Class;

    b.  Whether Defendants' conduct violates the Prompt Pay Provisions of Florida law;

    c.  Whether Florida law requires Defendants to pay interest at a rate of 12% per year on Overdue Payments;

    d.  Whether Defendants paid less than 12% on Overdue Payments for claims submitted by Plaintiffs and the Class;

    e.  Whether Plaintiffs and the Class are third-party beneficiaries of the Managed Care Contracts between the Agency and Defendants;

    f.  Whether Defendants breached the Managed Care Contracts;

    g.  Whether Plaintiffs and Class members conferred a benefit on Defendants;

16

h. Whether Defendants have been unjustly enriched by that benefit;

i. Whether a declaratory judgment is warranted to end the Defendants' policy and practice of unlawfully retaining interest owed on overdue payments;

j. Whether this is an action to enforce the terms of a health maintenance organization contract;

k. Whether Plaintiffs and Class members are entitled to damages, equitable relief, or other relief; and

l. The amount and nature of such relief to be awarded to Plaintiffs and the Class.

75. The Class may be certified under Rule 23(b)(2). Defendants have acted or refused to act on grounds generally applicable to the class, making final declaratory or injunctive relief appropriate.

76. The Class may be certified under Rule 23(b)(3). Questions of law or fact common to Class members predominate over any questions affecting only individual members. Class treatment of such common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of the courts and will promote efficiency of adjudication. Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit. There will be no unusual difficulty in the management of this action as a Class action.

## COUNT I
## Unjust Enrichment

Plaintiffs re-allege and incorporate paragraphs 1 – 76 above as if fully set forth herein and further allege as follows:

77. Plaintiffs and the Class conferred benefits upon Defendants by providing Medicaid services to individuals who subscribed to Defendants Medicaid managed care plans, which allows Defendants to generate interest on the Medicaid funds they hold.

78. Defendants had knowledge of these benefits, and voluntarily accepted and retained

the benefits conferred on them.

79.     Defendants have retained a portion of these benefits by illegally withholding the full amount of interest owed to Plaintiffs and the Class on Overdue Payments for claims, and were unjustly enriched thereby.

80.     Each member of the Class is entitled to recover the amount by which Defendants were unjustly enriched at his or her expense.

81.     This is an action brought to enforce the terms and conditions of HMO contracts which entitle Plaintiffs to recover their attorneys' fees and costs pursuant to Fla. Stat. § 641.28.

**COUNT II**
**Breach of Third-Party Beneficiary Contract**

Plaintiffs re-allege and incorporate paragraphs 1 - 76 above as if fully set forth herein and further allege as follows:

82.     Defendants entered into Managed Care Contracts with the Agency regarding the delivery of Medicaid services to Florida residents.

83.     Plaintiffs and Class members are third-party beneficiaries of the Managed Care Contracts between the Agency and Defendants.

84.     The Managed Care Contracts are governed by regulatory statutes and incorporate the relevant portion of the statutes in their terms.

85.     All Managed Care Contracts incorporate the Prompt Payment Provisions of Florida law and require Defendants to pay Medicaid providers 12% interest on Overdue Payments for claims for providing Medicaid services to individuals who enrolled in the Defendants' Medicaid managed care plans.

86.     Defendants have and continue to breach the Managed Care Contracts by withholding interest owed to Medicaid providers on Overdue Payments in violation of the Prompt

18

Pay Provisions.

87.     Plaintiffs have suffered damages as a direct and proximate result of Defendants' breaches of the Managed Care Contracts.

88.     This is an action brought to enforce the terms and conditions of HMO contracts which entitle Plaintiffs to recover their attorneys' fees pursuant to Fla. Stat. § 641.28.

## COUNT III
### Declaratory Judgment

Plaintiffs re-allege and incorporate paragraphs 1 - 76 above as if fully set forth herein and further alleges as follows:

89.     This is an action for declaratory judgment pursuant to Chapter 86, Fla. Stat.

90.     Plaintiffs have an ongoing business relationship with Defendants and Defendants' Managed Care Plan subscribers whereby Plaintiffs provide Medicaid services.

91.     Defendants are obligated to pay for such services with 12% interest on Overdue Payments as set forth above in Counts I and II.

92.     Plaintiffs and Defendants have a dispute as to whether Defendants have paid the proper amount of interest owed on Overdue Payments in accordance with the Prompt Pay Provisions of Florida law.

93.     The ongoing business relationship between Plaintiffs and Defendants is antagonistic and adverse due to the unresolved and contested ongoing issues set forth herein. These issues impacted and continue to impact not only the past, present and ongoing rights and liabilities of Plaintiffs and Defendants, but also the substantial public interest in the orderly administration of the Medicaid Managed Care Program and quality health care within the State of Florida.

94.     There is a bona fide, actual, present and practical need for the declarations, injunctive and supplemental relief requested herein; the declarations, injunctive relief and

supplement relief prayed for herein deal with a present, ascertained or ascertainable state of facts and a present controversy as to a state of facts; contractual and statutory duties and rights that are dependent upon the facts and the law applicable to the facts; the parties have an actual, present, adverse and antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before the court by proper process for final resolution.

95.     Plaintiffs seek a declaration that Defendants have failed to pay the 12% interest owed on Overdue Payments as required by the Prompt Pay Provisions of Florida law.

96.     This is an action brought to enforce the terms and conditions of HMO contracts which entitle Plaintiffs to recover their attorneys' fees and costs pursuant to Fla. Stat. § 641.28.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against the Defendants as follows:

(1) Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Class;

(2) Declaring that Defendants have failed to pay 12% interest on Overdue Payments as required by the Prompt Pay Provisions of Florida law;

(3) Enjoining Defendants from continuing the acts and practices described above;

(4) Awarding damages sustained by Plaintiffs and the Class as a result of Defendants' breaches of the Managed Care Contracts, together with appropriate prejudgment interest at the maximum rate allowable by law;

(5) Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

(6) Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(7) Awarding attorneys' fees and costs pursuant to Fla. Stat. § 641.28; and

(8) Awarding such other and further relief the Court deems just, proper and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 2nd day of August, 2017.

By: */s/Adam M. Moskowitz, Esq.*

| | |
|---|---|
| Adam M. Moskowitz, Esq. | Allan A. Joseph, Esq. |
| Fla. Bar No. 984280 | Fla. Bar No. 893137 |
| amm@kttlaw.com | ajoseph@fuerstlaw.com |
| Gail A. McQuilkin, Esq. | Christopher M. David, Esq. |
| Fla. Bar No. 969338 | Fla Bar No. 985163 |
| gam@kttlaw.com | cdavid@fuerstlaw.com |
| Michael R. Lorigas, Esq. | Michael B. Kornhauser, Esq. |
| Fla. Bar No. 123597 | Fla. Bar No. 029116 |
| mlorigas@kttlaw.com | mkornhauser@fuerstlaw.com |
| **KOZYAK TROPIN &** | **FUERST ITTLEMAN DAVID & JOSEPH** |
| **THROCKMORTON, LLP** | 1001 Brickell Bay Drive, Suite 3112 |
| 2525 Ponce de Leon Blvd., 9th Floor | Miami, Florida 33131 |
| Coral Gables, Florida  33134 | Telephone: (305) 350-5690 |
| Telephone: (305) 372-1800 | Facsimile: (305) 371-8989 |
| Facsimile: (305) 372-3508 | |

*Counsel for Plaintiffs*